IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

PRIMEX PLASTICS CORPORATION,

           Plaintiff,

    v.

CURTIS ZAMEC, THE NANCY L. ZAMEC
REVOCABLE TRUST, THE ZAMEC
MARITAL TRUST, THE ZAMEC FAMILY
TRUST and THE CURTIS J. ZAMEC
REVOCABLE TRUST,

           Defendants.

OPINION AND ORDER

15-cv-175-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      From early 2008 to the end of 2010, plaintiff Primex Plastics Corporation was a supplier of plastic to a company known as TriEnda, LLC. The two companies had a credit agreement, but TriEnda fell behind on its payments after its biggest customer stopped ordering new product and paying for product previously ordered. In the end, TriEnda failed to pay plaintiff approximately $2.7 million for goods plaintiff had supplied.

      Plaintiff attributes TriEnda's failure to pay to its negotiation of a new loan taken out primarily on behalf of its largest stockholder, defendant Curtis Zamec, to allow him to redeem shares of stock held by the trust of his late wife. Plaintiff contends that the redemption violated §§ 242.04(1)(a) and 242.04(1)(b)2 of the Wisconsin Fraudulent Transfers Act and seeks to collect damages from defendant Zamec. Defendants deny that the redemption was fraudulent in any respect or that it was the cause of TriEnda's inability to satisfy its debt to

plaintiff.

At trial, plaintiff failed to prove that defendant Zamec violated any provision of the two sections of Fraudulent Transfers Act on which plaintiff relied; in other words, plaintiff could not prove that he acted with actual intent to defraud plaintiff or any other creditor or that either he or TriEnda had engaged in a transfer without receiving a reasonably equivalent value in exchange at a time when they reasonably should have believed that TriEnda would incur debts beyond its ability to pay as they became due. Finally, plaintiff failed to prove causation, whereas defendants showed that TriEnda would have run out of funds to pay plaintiff no later than 13 months after the redemption, even if TriEnda had not negotiated a new loan in order to redeem shares from the Nancy L. Zamec Revocable Trust. I conclude therefore that defendants are entitled to judgment in their favor.

FINDINGS OF FACT

Plaintiff Primex Plastics Corporation is a New Jersey corporation with its principal place of business in Indiana. It manufactures and sells a variety of plastic products, primarily to commercial customers.

Until it was dissolved in December 2012, defendant TriEnda was a limited liability company with its principal place of business in Wisconsin. Defendant Curtis Zamec was TriEnda's managing member and majority owner; he is a citizen of Illinois and is the trustee of all of the defendant trusts, including the Nancy L. Zamec Revocable Trust. That trust plays a part in this litigation but the remaining Zamec trusts were named as defendants only as a

2

means of reaching property to which plaintiff might have a claim.

Defendant Zamec acquired TriEnda in 2007, when his then-employer, Wilbert, Inc., decided to sell its TriEnda plastics division and concentrate on its custom parts business. He saw the purchase of TriEnda as an opportunity to take over the manufacturing of the plastic pallet top decks Wilbert had been supplying to Schoeller Arca Systems (SAS), a leading manufacturer of plastic pallets. Zamec and two other investors bought the TriEnda division for $20 million at the end of 2007. Zamec held 64% of the stock; the other two investors held 34% between them. At the time, TriEnda's revenues were $66 million, with EBITDA (earnings before interest, taxes, depreciation and amortization) of $6 million.

Under its new management, TriEnda manufactured single and twin sheet thermoformed plastic products, including a range of plastic shipping pallets. In 2008, shortly after it was formed, the company entered into a written credit agreement with plaintiff, under which plaintiff agreed to provide materials on 30-day, interest-free credit and TriEnda agreed to certain credit terms for any purchases made thereafter. About the same time, TriEnda signed an exclusive five-year strategic supply agreement to sell plastic pallet top decks to SAS. The agreement made SAS TriEnda's dominant customer immediately, accounting for approximately two-thirds of the company's sales in 2008 and 87% in 2009.

SAS had its own five-year contract to sell plastic pallets to Intelligent Global Pooling Systems, the world's largest plastic rental company, which rented pallets to large volume multinational shippers around the world, such as General Mills, Dole, Pepsico and SC Johnson. iGPS had raised at least $400 million in funding for its pallet production. (It was

the first company to provide all-plastic pallets with embedded RFID radio-frequency identification tags). TriEnda and SAS estimated orders under their contract at 6 million sales of top decks each year, for an annual revenue of $155 million to $180 million.

In 2008, TriEnda's total revenue was $104 million, with EBITDA of $9.5 million. In 2009, it was $177 million, with $10.7 EBITDA.

In May 2009, defendant Zamec's wife, Nancy, died. Around that time, he began the process of liquidating the Nancy Zamec trust's ownership interest in TriEnda through a redemption of shares, which would help him settle his wife's estate.

In October 2009, TriEnda hired William Blair & Company, an investment banking firm, to find a lender willing to finance the share redemption and refinance TriEnda's pre-existing corporate debt. The company had sales of 1.8 million top decks in 2008 and was projecting increases of the sales of its product to 5.3 million in 2009, 6.7 million in 2010, 6 million in 2011 and 2012 and 4.4 million in 2013, for total sales of more than 30 million top decks. At the time, TriEnda had a credit agreement with J P Morgan Chase Bank in the amount of $21.5 million, $13 million of which was in a revolver loan, that is, a loan that allowed the loan amount to be withdrawn, repaid and withdrawn again in any manner and any number of times. The remainder of the loan was a term loan of $8.5 million.

William Blair sent a debt facility offering memorandum to several financial institutions, including Fifth Third Bank. From its review of the memorandum, Fifth Third understood that the purpose of the offering was to refinance TriEnda's existing credit lines into a comprehensive financing arrangement and repurchase the majority of the ownership interest

then held by the Nancy Zamec trust. As part of its pre-offer due diligence, Fifth Third met with TriEnda officials to evaluate the TriEnda-SAS contract and the TriEnda/SAS/iGPS supply chain.

After completing its evaluation of the refinancing, Fifth Third Bank submitted an offer for a loan of $35 million, $14.75 million of which was to be used for the redemption of the Nancy Zamec trust units, with the remainder to be used to increase TriEnda's working capital. Fifth Third Bank had reviewed the the company's historic and projected performance figures and was satisfied that the redemption was not likely to be financially harmful to TriEnda.

TriEnda chose the Fifth Third proposal after comparing it to other offers received by William Blair. Zamec signed a term sheet with Fifth Third Bank on December 2, 2009, after which bank undertook additional due diligence on the proposed transaction, reviewing financial reports, accounts receivables, inventory reports and accounts payables. In addition, it conducted a field examination, hired an appraiser and evaluated the projections and underlying assumptions and had its counsel conduct an independent review of the TriEnda-SAS agreement. Fifth Third was aware that the SAS contract represented 80-85% of TriEnda's business. For this reason, it evaluated the contract and the supply chain to confirm that there was interest in maintaining the contract, as well as to examine the supplier relationship and iGPS's ability to pay.

As of November 2009, TriEnda owed, and was paying, plaintiff about $10 million for purchases of product made under their credit agreement. On December 11, 2009, after TriEnda had signed a term sheet outlining the terms of the refinancing by Fifth Third and

while the bank was conducting due diligence, defendant Zamec and TriEnda received an email from the president of SAS, Robert Engle, saying that SAS was lowering its sales estimates for the first quarter of 2010. At the time, SAS's monthly orders from TriEnda were approximately 500,000 plastic pallets, using plaintiff's materials.

In December 2009, two different firms undertook valuations of the company. Neither found the company insolvent. Wipfli, LLC, prepared a preliminary valuation of the company's equity as of December 15, 2009, for estate settlement purposes, assessing its fair market value at $60.4 million. Capital Valuation prepared its own assessment, determining TriEnda's fair value as of December 30, 2009 for the purpose of redeeming member units, as $53.3 million, with the equity value at $46,454,000, plus the $7 million of excess cash for the redemption.

Immediately after receiving the SAS email, defendant Zamec called the president of iGPS, Rex Lowe, to ask about the slowdown. Sometime later, SAS told Zamec it had been informed by iGPS that it would no longer accept all of the pallets that SAS produced each month. Instead, it would determine its needs one month at a time and accept only that amount. Engle told Zamec that iGPS would meet monthly with SAS to discuss its needs for the coming month.

TriEnda advised Fifth Third of the change in orders and asked whether the slowdown in orders would affect the proposed debt transaction. After analyzing the slowdown and the expectations going forward, Fifth Third modified its projections and restructured the transaction, but concluded that the slowdown was not going to be permanent. TriEnda agreed

6

with Fifth Third to cut the amount of the term loan to $7 million from $14 million, thereby halving the size of the Nancy Zamec trust redemption.

On December 14, 2009, Zamec directed his senior staff, led by Ray Kolodziej, to develop a cost reduction plan and to prepare a revised 2010 forecast for Fifth Third. Kolodziej projected that SAS would order 350,000 units from TriEnda during March 2010, 450,000 units during April and 500,000 units each month from May through December, for an annual 2010 total of 5.4 million, which represented a 10% reduction from TriEnda's original 2010 projections. TriEnda provided the revised 2010 forecast to Fifth Third on December 21, 2009.

Kolodziej described the conditions that would create temporary cash flow shortfalls of $4.8 million for the company during the first quarter of 2010 as "a perfect storm." He recommended plant closings for an extended period of time, layoffs of certain workers and the imposition of extended payment terms on TriEnda's vendors. All of these steps were taken.

On December 22, 2009, TriEnda's president, Jan Acker, wrote to advise plaintiff that TriEnda's product requirements for the first quarter of 2010 would be reduced because of a design change from its largest customer, but that it hoped that sales to this customer would exceed the first quarter forecasts, as had been the case historically. TriEnda told plaintiff that it would adjust its supply chain payment terms to 75 days because of its customer's transition timeline.

On December 23, 2009, William Blair structured a reduced proposed refinancing transaction with Fifth Third to accommodate TriEnda's 2010 forecast. On December 29,

7

2009, TriEnda transferred $7 million to the Nancy Zamec trust, enough to redeem only half the shares originally contemplated by the parties. The final price was $533,000 per share for 13.21 units. To obtain the new financing, TriEnda paid approximately $1.4 million in associated fees to Fifth Third Bank, William Blair and various lawyers.

Despite the anticipated slowdown for the first few months of 2010, the company's outlook was positive. Both the company's management and the bank had good reasons to anticipate that the pace of sales would increase after the first three months: Fifth Third Bank had demonstrated its continued willingness to lend the company approximately $26.2 million after conducting its own investigation into the anticipated slowdown, iGPS had raised $400 million in funding on the strength of its conviction that its pallet model would be successful and TriEnda's existing supply contract gave it a basis for future sales projections.

On January 29, 2010, SAS told TriEnda that the forecast for 2010 had the potential to return up to 6 million pallets. As of March 11, 2010, TriEnda's year to date revenue was $25.7 million, compared to a budget of $22.5 million, an increase driven primarily by sales to SAS.

In the late spring of 2010, SAS stopped ordering new product and stopped paying its invoices from TriEnda. In December 2010, iGPS failed completely. TriEnda was able to obtain payments totaling $4.5 million from SAS but is still owed $8.5 million. Despite the additional $6 million in working capital it had obtained from Fifth Third Bank, TriEnda was unable to continue as a going concern, although it continued to make payments to creditors such as plaintiff until February 2011.

On June 24, 2011, TriEnda had an Article 9 bankruptcy sale. Later, Fifth Third conducted an Article 9 secured party sale of TriEnda's remaining assets, for $27.1 million.

The records of TriEnda's accounts payables confirm that on January 1, 2010, TriEnda held 368 open invoices from its various vendors, of which only 35 were past due. By dollar volume, only $229,011 of vendor debt was past due, while $1,914,694 in vendor debt that had been incurred was not yet due. To date, TriEnda has failed to satisfy approximately $2,671,801.53 in invoices issued by plaintiff for goods purchased by TriEnda under the Credit Agreement between the parties. This amount is reflected in a judgment entered by the United States District Court for the Southern District of New York against TriEnda and in favor of plaintiff. More than 99% of this judgment was derived from invoices generated by plaintiff after the December 2009 redemption of the shares of the Nancy Zamec trust and after TriEnda had implemented the 75-day payment terms.

TriEnda ran out of money with which to pay plaintiff in February 2011. Had it never taken out a loan from Fifth Third Bank for the redemption of the Nancy Zamec trust shares it would have run out of money to pay plaintiff and other vendors within a few weeks of the time it ran out of money under Fifth Third loan.

## OPINION

### A. Violations of Wisconsin Statutes

In its complaint, plaintiff alleged four causes of action. The first two claims were brought under Wisconsin's Uniform Fraudulent Transfer Act: (1) actual intent to defraud on

9

the part of defendant Curtis Zamec, in violation of Wis. Stat. § 242.04(1)(a) and (2) making a transfer fraudulent as to present creditors, in violation of Wis. Stat. § 242.05. The third claim was one alleged against defendant Zamec for breach of fiduciary duties and the fourth was the imposition of a constructive trust on the trusts created by defendant Zamec on the ground that the trusts are holding funds that should have been used to pay plaintiff. (The fourth claim rises or falls on plaintiff's claims of fraudulent transfer and need not be discussed separately.)

At trial, plaintiff proceeded on only one of the claims it had asserted originally, plus one that was not in the original complaint. It contended, first, that defendant Zamec had acted with actual intent to hinder, delay or defraud any creditor when he proceeded with the redemption of shares of the Nancy Zamec trust shares, in violation of Wis. Stat. § 242.04(1)(a), or, second, that he had acted "[w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation . . . [and he] [i]ntended to incur . . . debts beyond the debtor's ability to pay as they became due," in violation of Wis. Stat. § 242.04(1)(b)2.

1. Actual intent

To prove actual intent to defraud under Wis. Stat. § 242.04(1)(a), a plaintiff must prove that the defendant made the transfer or incurred the obligation "with actual intent to hinder, delay or defraud any creditor of the debtor." (The little Wisconsin law on the subject suggests that the standard of proof is clear and convincing, Mann v. Hanil Bank, 920 F. Supp. 944, 950-51 (E.D. Wis. 1996); Williams v. Rank & Son Buick, Inc., 44 Wis. 2d 239, 242,

170 N.W.2d 807 (1969), but it is not necessary to decide whether this is correct because plaintiff has not shown it could meet either this standard or the lower one of preponderance of the evidence.) The statute applies whether the creditor's claim arose before or after the transfer was made or the obligation incurred. § 242.04(1).

Actual intent to defraud is a difficult claim to prove. Nevertheless, plaintiff contends that it proved at trial that TriEnda's redemption of the Nancy Zamec trust shares exhibits six out of the 11 factors set out in Wis. Stat. § 242.04(2) to help courts determine actual intent. In fact, it proved only one of the factors, which is that the transfer was to an insider (defendant Zamec).

Plaintiff believes it was a concealed transfer, whereas in fact defendant Zamec's desire to redeem shares was known to TriEnda's executives, to William Blair & Company, to Fifth Third Bank and to the other banks that reviewed the William Blair materials. True, the loan was not made known to plaintiff, but defendants were under no obligation to keep its supplier advised of a stock redemption or a new loan. The supplier agreement required TriEnda to advise plaintiff of any change of company ownership, but redeeming a portion of the Nancy Zamec trust shares would not change the company ownership.

Plaintiff contends that the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred, which is another one of the statutory factors. If its contention is accurate, it would tend to show intent to defraud. However, plaintiff's argument rests on the erroneous proposition that a transfer to a company of shares of company stock is never of any value to the company. That may be true in certain

situations, such as when the company is insolvent at the time it redeems stock, Consolve v. Cohen (In re Roco Corp), 701 F.2d 978, 982 (1st Cir. 1983), but, as explained in In re Mi-Lor, 348 F.3d 294, 307 (1st Cir. 2003), In re Roco Corp. does not stand for the proposition that redemption of stock never benefits a corporation. The court pointed out in Mi-Lor that "[t]he corporation, for its part, received stock back, which enhanced the value of its remaining shares and which conceivably could have led to some benefit to it." See also Perkins v. Haines, 661 F.3d 623, 627 (11th Cir. 2011) (reiterating that redemption by *insolvent* corporation of its stock does not transfer anything of value to corporation); Boyer v. Crown Stock Distributing, Inc., 587 F.3d 787, 792 (7th Cir. 2009) (finding intent to defraud in instance of leveraged buy-out that was "doomed to go broke after and because of the LBO" because burden of debt created by transaction was so heavy that corporation had no reasonable prospect of surviving.

      Plaintiff contends that TriEnda was insolvent at the time of the redemption, but it did not prove that contention at trial. Plaintiff's expert, Robert Zak, testified that in his opinion, the company was insolvent, but his reasoning was not persuasive. He never undertook any independent assessment of TriEnda, but based his opinion on a prior valuation of the company prepared by Capital Valuation in February 2012 for prior litigation involving TriEnda. (This was a different valuation from the one prepared in December 2009.) In the 2012 valuation, Capital Valuation assessed the company as of December 2009, using conservative estimates, and concluded it had been solvent at the time of the redemption and that its fair value had been $53.3 million. In reaching that conclusion, it used an additional

12

size premium of 9.53%, the same size premium assessed for companies that are speculative or distressed or both. Defendants emphasized that if Capital Valuation had stayed within the same Ibbotson's decile but compared TriEnda to the entire decile and not just the bottom half, the cost of equity capital would have been reduced to 3.72%. This seems reasonable, given TriEnda's good health at the time. Capital Valuation also used a 4% or 5% risk factor specific to TriEnda to account for the fact that TriEnda was dependent on one major customer and it applied a 20% discount for lack of marketability.

Zak disagreed with Capital Valuation's finding that the company's fair value was $53.3 million just before and just after the redemption. In his view, it was appropriate to apply to that valuation a 28% discount for lack of control (the redemption of half of the Nancy Zamec trust shares) and a 20% discount for lack of marketability. Finally, Zac criticized Capital Valuation's reliance upon "projections for increasing revenues and profits for 2010 and 2011 that were already shown to be questionable, if not wholly inaccurate, as of the date of the Valuation Report, and would ultimately prove to be untenable during 2010 and 2011." Zak Rep., dkt. #66 at 105.

In applying the 20% discount for lack of marketability, Zac overlooked the fact that Capital Valuation had already applied the discount in its analysis. Moreover, he applied the discount to the $7 million of excess cash that made up the $53.3 million value found by Capital Valuation. It was error for Zak to apply the 20% discount for a second time, although he may not have realized that Capital Valuation had already taken it. It was another error to apply the discount to the $7 million of cash, which clearly does not suffer from marketability

13

problems. Finally, it was error for him to base his opinion on what he knew later about the eventual unraveling of the TriEnda-SAS sales agreement. At the time of the redemption, the parties had a reasonable belief that the supply arrangement would continue and grow, given what they knew about iGPS's funding and its stature and the market enthusiasm for the product.

(It may have been another error for Zak to assess a 28% discount for a minority position; defendants say it was because it was part of the majority owner's holdings, but neither side has presented enough evidence on this point to allow me to assess the merits of the discount.)

Zak erred again when he considered what he said were statements to creditors by TriEnda's president, Jan Acker, that the company would not be paying its debts as they became due. He did not identify any evidence in the record to show that Acker made such a statement to a creditor or to anyone else and I have found none. In fact, the company continued to pay its debt for twelve months or until December 2010. In view of plaintiff's inability to prove by clear and convincing evidence that TriEnda was insolvent in December 2009 when defendant Zamec redeemed shares of the Nancy Zamec trust, it is not possible to find that Zamec carried out the redemption with the intent to defraud TriEnda's creditors, in violation of Wis. Stat. § 242.04(1)(a). This is particularly true in light of Fifth Third's re-investigation of the viability of the loan in light of the concerns that arose when SAS told TriEnda it would not be making as many purchases in the first few months of 2010 as it had anticipated.

14

2. Constructive fraud

Plaintiff fares no better with its claim under Wis. Stat. § 242.04(1)(b)1, that defendant TriEnda incurred an obligation without receiving a reasonably equivalent value in exchange and the company intended to incur debts beyond its ability to pay as they became due. This claim is usually referred to as one for constructive fraud. General Electric Capital Corp. v. Lease Resolution Corp., 128 F.3d 1074, 1079 (7th Cir. 1997) (discussing Illinois's Uniform Fraudulent Transfer Act, 740 Ill. Comp. Stat. 160/5, which tracks § 242.04(1) of Wisconsin's Act). Plaintiff contends that TriEnda and defendant Zamec knew or had reason to believe that TriEnda's assets were unreasonably small in relation to the cost of the planned redemption. It cites the declining business of the company; its failure to discount the shares from the trust as minority interests in the corporation; the allegedly unreasonable price Zamec obtained for the redeemed shares in light of the value of the company; and the company's alleged insolvency after the redemption.

Under either a clear and convicing or preponderance of the credible evidence standard, plaintiff has failed to meet its burden. It did not prove either that TriEnda did not receive a reasonably equivalent value in exchange for the obligation or that defendant Zamec reasonably should have believed at the time the company went forward with the redemption that it would incur debts beyond its ability to pay as they became due.

Plaintiff repeats its claim that the redemption of stock is of no value to a company. This is true when the company is insolvent at the time, but, as I have found, TriEnda was not insolvent when defendant Zamec redeemed the shares of the trust or afterwards. As of

15

December 30, 2009, it was a going concern, with revenues projected into the future, a five-year contract with SAS and assets exceeding liabilities. It had a greater ability to repay its debt to plaintiff after the transfer because of its increased working capital under the Fifth Third loan and the reduction in borrowing costs from $236,000 a month to $375,000 a quarter. Fifth Third had conducted its own assessment of the viability of the loan and was satisfied that the smaller loan was a safe one for it to fund.

Plaintiff contends that if TriEnda had not incurred costs of $1.4 million to obtain the new loan, it could have used that same money to pay plaintiff and other suppliers after SAS stopped paying for the product it had ordered, but it has not adduced any evidence to prove that the money would have been available for that purpose or that it would have been sufficient to pay all of its suppliers. The fact is that TriEnda had a reasonable belief that it would have income sufficient to pay for the supplies it was ordering from plaintiff. Indeed, for the first four months after the redemption, the company generated income before taxes. Between November 2009 and February 2010, TriEnda had paid plaintiff approximately $5.3 million. By the end of 2010, it had paid all but $10,041 of the approximately $9.2 million it owed plaintiff at the end of 2009. Plaintiff has failed to show that it was the victim of a fraudulent transfer under Wis. Stat. § 242.04(1)(b)2.

## B. Causation

In bringing this case, plaintiff has maintained consistently that if defendants had never

taken out a loan to cover the redemption of the Nancy Zamec shares and incurred the associated costs, TriEnda would have had money to pay all of its vendors. It does so despite its inability to produce evidence to support its position. As I have found, TriEnda would have run out of money to pay plaintiff in early 2011, whether or not it had secured the new loan. Its inability to pay its creditors was not caused by the redemption of the shares from the trust or from borrowing money for the redemption, but by the collapse of iGPS's plastic pallet effort and SAS's resulting failure to pay the $8.5 million it owed TriEnda for previous shipments of plastic pallet top decks. These failures were beyond defendants' power to have prevented or to have anticipated in December 2009.

In plaintiff's view, defendants could have used the term loan to pay the remainder of what defendants owed plaintiff had it not used the money for redeeming the Nancy Zamec shares. However, it has cited no evidence to support this argument or addressed the requirements of the "Loan and Security Agreement among TriEnda, LLC, and Fifth Third Bank, as Agent and the Lenders party hereto." Dkt. #66, at 32, ¶ 8.9. Under the agreement, TriEnda could use the borrowed funds "on the Closing Date," for certain specified purposes, including the financing of the Zamec redemption. "After the Closing Date," however, the proceeds could be used only for "working capital and general company purposes of the Borrower." Id.

Plaintiff produced no evidence to confirm its contention that "greater company purposes" would include paying suppliers. In contrast, both Ray Kolodziej and Curtis Zamec confirmed at trial their understanding that TriEnda could not have used the term loan from

17

Fifth Third Bank to pay short-term creditors. Their position was echoed by Bert Kidd, who handled the loan negotiations for the bank, and testified at his deposition, dkt. #18-12 at 125, that the term loan was extended to TriEnda for the specific purpose of redeeming the trust shares. Kidd added that a term loan is not usually thought of as part of working capital, but is reserved for other purposes, such as new buildings or large equipment, whereas working capital is used to finance a revolving line of credit to meet the constantly changing demands of an ongoing business. Id.

TriEnda had a much larger line of credit for working capital with Fifth Third than it had with Chase, but in either case, the loan was tied to receivables. This meant that when SAS stopped ordering new pallets and paying for the ones they had received, TriEnda's receivables went down and its borrowing capacity contracted. By February 2011, when SAS was no longer paying for its September, October and November 2010 orders, TriEnda had no ability to borrow against its receivables because they had become too old. This unfortunate result would have been delayed a few weeks under the Chase Loan but the result would have been the same: TriEnda could not have paid plaintiff all that it was owed.

Plaintiff's retained expert, Robert Zak, did not discuss the question of causation. He testified that he was not offering any opinion about what caused TriEnda's inability to pay plaintiff untimely or not at all. Tr. trans., dkt. #62, 1-P-92-94.

Even without any corroborating opinion from Zak, plaintiff maintains that it has shown causation by establishing at trial that TriEnda's inability to pay plaintiff the full amount of its invoices was the result of the company's expenditure of $8.4 million on December 30, 2009

18

to cover the $7 million redemption and the $1.4 million in costs associated with obtaining the Fifth Third loan. Plaintiff is mistaken. TriEnda failed, but not because of the redemption. It failed because SAS stopped ordering new product or paying for previously shipped product and it would have failed with or without the redemption.

In short, plaintiff has failed to prove that TriEnda's decision to take out a new loan from Fifth Third Bank, at defendant Zamec's instigation, caused its inability to pay plaintiff for all of the supplies it had sold to TriEnda. This failure is a critical one. "The requirement of proving loss causation is a general requirement of tort law. . . Even the authors of the Prosser treatise, though critical of the rule in general, do not criticize its application in a fraud case." Movitz v. First Nat. Bank of Chicago, 148 F.3d 760, 763, 762-63 (7th Cir. 1998)." See also Conder v. Union Planters Bank, N.A.. 384 F.3d 397, 401 (7th Cir. 2004) ("imposing liability on someone who hasn't actually caused a harm (because the harm would have occurred anyway) creates incentives to take excessive, and therefore socially wasteful, precautions"). Defendants are entitled to judgment in their favor.

ORDER

IT IS ORDERED that the clerk of court is to enter judgment in favor of defendants Curtis Zamec, The Nancy L. Zamec Revocable Trust, The Zamec Marital Trust, the Zamec Family Trust and the Curtis J. Zamec Revocable Trust and close this case.

Entered this 25th day of July, 2016.

> BY THE COURT:
> /s/
> BARBARA B. CRABB
> District Judge